# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHARLES K. GATEBE,          *

     Plaintiff              *

     v.                  *        Civil Action No. 8:18-cv-00182-PX

JAMES F. BRIDENSTINE,      *
Administrator, NASA,
                         *

     Defendant
                        ***

## MEMORANDUM OPINION

Pending in this employment discrimination case is Defendant James F. Bridenstine, the Administrator of the National Aeronautics and Space Administration ("NASA")'s Motion to Dismiss, or Alternatively, for Summary Judgment. ECF No. 25. The motion is fully briefed, and a hearing was held on November 19, 2018. For the reasons that follow, the Court grants in part and denies in part NASA's motion.

## I.      Background

Plaintiff Dr. Charles Gatebe, an African American man, began working at the NASA Goddard Space Flight Center in Greenbelt, Maryland, in 2000, through a Cooperative Agreement with the University of Maryland, Baltimore County. ECF No. 11 ¶ 36. On April 20, 2011, Dr. Gatebe was offered the position of Manager II with the Universities Space Research Association ("USRA"), another organization performing work at the NASA Goddard Space Flight Center. *Id.* ¶ 31. Before Dr. Gatebe began work on the new job in May of 2011, NASA had to approve Dr. Gatebe's qualifications. *Id.* ¶¶ 32, 33.

In his current position, Dr. Gatebe manages twenty USRA employees at NASA and performs research in atmospheric sciences collaboratively with NASA. *Id.* ¶¶ 33, 38. Both

USRA and NASA assign work to Dr. Gatebe, including work involving the Cloud Absorption Radiometer and the Bidirectional Reflectance Distribution Function, Albedo, Cloud, Aerosol Radiometer. *Id.* ¶¶ 38–39. All of Dr. Gatebe's work is conducted on NASA property and NASA provides Dr. Gatebe's office space and other resources. *Id.* ¶¶ 41–42. USRA provides Dr. Gatebe's salary and benefits. ECF No. 25-6 at 1. Dr. Gatebe is directly supervised by USRA employee Dr. William Corso, and his second-level supervisor is Dr. Charles Ichoku of NASA. ECF No. 11 ¶ 33; ECF No. 25-30 at 1.[1] Dr. Ichoku describes his role as "see[ing] that overall, [Dr. Gatebe's] research is in line with NASA's Strategic goals" and "collaborat[ing] on some research." ECF No. 25-8 at 1.

**A. Dr. Gatebe's Applications for Exclusive Employment with NASA**

Between 2009 and 2015, Dr. Gatebe has applied for nine open positions to work exclusively for NASA and was not selected for any of the positions. ECF No. 11 ¶¶ 43–44, 47, 50. In 2009, NASA rejected Dr. Gatebe for the position of Experimental Scientist. *Id.* ¶ 43. Between 2011 and 2013, NASA rejected Dr. Gatebe for six Atmospheric Science positions, four of which Dr. Gatebe had reached the final interview phase. *Id.* ¶ 58. In 2015, NASA rejected Dr. Gatebe for the positions of Physical Scientist in the Earth Sciences Division ("the management position") and Research Physical Scientist in the Climate and Radiation Laboratory, also within the Earth Sciences Division ("the research position"). *Id.* ¶¶ 47, 50. These latter two positions are the primary subject of the Complaint.

Dr. Gatebe asserts that his experience is not unique. In the past twenty years, only one African American has been selected as a Physical Scientist in the Climate and Radiation Laboratory. No African American occupies any senior management positions in the Earth

---

[1] Although Dr. Gatebe refers to Dr. Ichoku as his supervisor, NASA uses the term "sponsor." ECF No. 25-8 at 1. Regardless of the label, Dr. Ichoku actively participates in managing Dr. Gatebe's work.

Science's Division. *Id.* ¶ 59; ECF No. 25-30 at 9.

### i. The Management Position

The Goddard Space Flight Center's Office of Human Capital Management, in consultation with a subject matter expert, reviewed the applications for the management position and pre-selected four qualified applicants, which included Dr. Gatebe. ECF No. 25-18 at 3. Dr. James Irons, Deputy Director of the Earth Sciences Division, Science Exploration Directorate, led the interview panel responsible for selecting the management position. ECF No. 11 ¶ 46; ECF No. 25-18 at 1. The panel consisted of Dr. Irons, Dr. Kenneth Ranson, Dr. Scott Braun, and Shane Dover, all white men. ECF No. 25-30 at 2. The panel asked each applicant the same six questions, which were designed to explore the applicants' previous experience, career goals, communication styles, and vision for the Earth Sciences Division. ECF No. 25-19. Three of the panelists kept contemporaneous handwritten notes reflecting the candidates' answers. ECF Nos. 25-19, 25-20, 25-22.

After completing the interviews, the panelists discussed the candidates and came to a consensus as to the most qualified for the position. ECF No. 25-21 at 3. The panelists prioritized candidates with experience in planning, organizing, and managing airborne science field campaigns, and unanimously selected Christy Hansen, a white woman. ECF No. 25-18 at 3; ECF No. 25-21 at 3; ECF No. 25-23 at 2. The panelists unanimously agreed that Dr. Gatebe was the second most qualified candidate. ECF No. 25-18 at 4; ECF No. 25-21 at 5; ECF No. 25-23 at 3.

Christy Hansen had previous experience planning, implementing, and managing a multi-year NASA airborne mission, Operation Ice Bridge, that had three annual field deployments. ECF No. 25-21 at 4. Ms. Hansen also managed the Arctic Radiation IceBridge Sea and Ice

Experiment. ECF No. 25-18 at 3. Altogether, Ms. Hansen had managed eight campaigns, each with three to five instruments operated by three to five investigation teams. *Id.* at 4. Ms. Hansen received awards for her work on these campaigns. ECF No. 25-17 at 2. Prior to this work, Ms. Hansen worked as a robotic refueling mission operations manager from 2010–2012 and an engineer, astronaut instructor, and flight controller from 1999–2010. *Id.* at 3–4. Ms. Hansen holds a Master's Degree in Space Studies from the University of North Dakota. *Id.* at 7.

Dr. Gatebe has sixteen years of experience in airborne missions and has managed three instruments: Cloud Absorption Radiometer ("CAR"), CAR Autonomous Navigation System, and Bidirectional Reflectance Distribution Function, Albedo, Cloud, Aerosol Radiometer. ECF No. 25-30 at 4. Dr. Gatebe won several achievement awards for his work on airborne field campaigns. *Id.* at 5. He now works as a Group Lead, supervising twenty scientists on various projects. *Id.* at 7. However, Dr. Gatebe has not managed multiple investigators and airborne assets on a cohesive field campaign, a fact weighted heavily by the interviewing panel. ECF No. 25-18 at 4. Dr. Gatebe received a doctorate in atmospheric physics, *summa cum laude*, from the University of Witwatersrand in Johannesburg, South Africa. ECF No. 11 ¶ 37; ECF No. 25-16 at 4.

After the interview, Dr. Irons informed Dr. Gatebe that his interview went well and his qualifications were "very good." ECF No. 25-30 at 3. Dr. Irons also told Dr. Gatebe that there was "no merit reason" for his non-selection. ECF No. 11 ¶ 53.

### ii. The Research Position

Dr. Lazaros Oreopoulos of the Climate and Radiation Laboratory led the interview process for the research position. ECF No. 25-24 at 1. Previously, Dr. Oreopoulos had informed Dr. Gatebe that he had somebody in mind for the position and that the job announcement was

just a routine to comply with the agency's hiring requirements. ECF No. 25-30 at 11. The Goddard Space Flight Center's Office of Human Capital Management, in consultation with a subject matter expert, selected an unknown number of applicants as qualified for the research position. ECF No. 25-24 at 2. Included for the final interview was Dr. Gatebe. Dr. Oreopoulos then led a panel interview for each of the qualified applicants. *Id.* The panel consisted of Dr. Oreopoulos, Dr. Nickolay Krotkov, and Dr. Donifan Barahona. *Id.* The first two panelists are white men and the latter is a man of "[m]ixed race of Hispanic background." *Id.*; ECF No. 25-25 at 2; ECF No. 25-26 at 2.

The panelists asked each applicant nine questions, compiled by Dr. Oreopoulos, which focused on experience, leadership, community service, and development of NASA's mission. ECF No. 25-28. Only Dr. Oreopoulos provided his own non-handwritten notes on the candidates' answers to these questions. *Id.* Dr. Oreopoulos considered the candidates' experience, publications, and stature in the scientific community, and recommended Dr. Daniel Feldman, a white man, for the position. ECF No. 25-24 at 2–3. Dr. Krotkov "was not asked to score or rank candidates." ECF No. 25-25 at 2. Nor did Dr. Krotkov know who was selected for the position or the reasons for such selection. *Id.* at 3. Dr. Barahona discussed the candidates with Dr. Oreopoulos and agreed that Dr. Feldman was best suited for the position. ECF No. 25-26 at 2–3.

Dr. Feldman declined the job offer. ECF No. 25-24 at 7. The position was never filled. *Id.* Dr. Oreopoulos asserts that the position was not filled because no other candidate was qualified for the position. *Id.* Contradicting Dr. Oreopoulos' account, Dr. Gatebe alleges that the position was subsequently offered to an unnamed applicant, who also declined the offer. ECF No. 25-30 at 10.

Dr. Feldman was employed at the Lawrence Berkeley National Laboratory, performing atmospheric science and climate-related research with a focus on radiation science. ECF No. 25-27 at 1. His previous work involved using atmospheric radiation codes and simulating radiance for climate model runs. *Id.* at 1–2. Dr. Oreopoulos credited Dr. Feldman's first-author publication in the journal *Nature* (with an unknown number of citations). ECF No. 25-24 at 4. Dr. Oreopoulos also "deemed [Dr. Feldman's career] to be in an ascending trajectory with great potential for excellence." *Id.* Dr. Feldman received a doctorate in Environmental Science and Engineering from the California Institute of Technology in 2008. ECF No. 25-27 at 4.

In addition to Dr. Gatebe's qualifications described above, Dr. Gatebe published at least nineteen papers, and he was the first author listed for twelve of the papers. ECF No. 25-16 at 5–7. According to Dr. Oreopoulos, three of Dr. Gatebe's publications received a total of 27 citations from other authors, a number which Dr. Oreopoulos interprets as "modest." ECF No. 25-24 at 6–7. Dr. Barahona noted Dr. Gatebe's "extensive experience in radiation research," but stated he had less experience in developing radiative codes for atmospheric models. ECF No. 25-26 at 5. According to Dr. Gatebe, he works with models for satellite assessment of direct radiative forcing by wildfire aerosols. ECF No. 25-16 at 2. It is unclear the overlap, if any, between Dr. Gatebe's work on radiation and the job's requisite experience in radiative transfer algorithms and radiative transfer modeling. *See* ECF No. 25-14 at 2.

**B. Encounters with Robert Cahalan**

Dr. Gatebe also recounts a series of much earlier unfavorable exchanges with Robert Cahalan, a Lab Chief in the Laboratory for Atmospheres, as part of his retaliation and hostile work environment claims. In 2011, Mr. Cahalan shouted at Dr. Gatebe to stop speaking with Civil Servants about funding for his projects and forced Dr. Gatebe "to make unnecessary

changes in a journal paper," even though Mr. Cahalan was not an author on the paper. ECF No. 11 ¶¶ 63, 65. Finally, Mr. Cahalan sent Dr. Gatebe an email, which Dr. Gatebe characterizes as "threatening." *Id.* ¶ 64. The email reads:

> Charles,
> Your "I have clarified S" sentence is precisely what I instructed you NOT to do. I believe you understood this, but apparently you chose to ignore my direction to you. Of course, I'm not your supervisor. If I was, (i.e. if you were a civil servant in my group) then this would be a serious problem. If you disagree with my interpretation of your "I have clarified S" sentence, then please come see me.
> -Bob-

ECF No. 25-29 at 1.

## C. Dr. Gatebe's Initial Contact with the EEO

On June 18, 2015, after learning that he was not selected for the above positions, Dr. Gatebe contacted the EEO. ECF No. 11 ¶ 24.[2] Dr. Gatebe had not complained to the EEO prior to 2015. Shortly after the initial EEO contact, Dr. Oreopoulos told Dr. Gatebe that he should not have gone to the EEO and doing so would have negative consequences for him in the future. ECF No. 11 ¶ 61. Additionally, Dr. Steven Platnick, Deputy Director for Atmospheres, Earth Sciences Division, told Dr. Gatebe that he was unhappy with Dr. Gatebe's EEO contact, that Dr. Gatebe could not be part of the "610 family" (the Earth Sciences Division), and that Dr. Gatebe has jeopardized his future with NASA by contacting the EEO. *Id.* ¶ 62. Dr. Platnick also told Dr. Gatebe that people would avoid Dr. Gatebe as a result of his EEO involvement. ECF No. 25-5 at 3.

## D. Procedural History

Dr. Gatebe filed a formal EEO complaint in September 2015. ECF No. 25-5. The NASA

---

[2] This date is taken from Dr. Gatebe's Amended Complaint and the EEO Counseling Report. ECF No. 11 ¶ 24; ECF No. 25-4 at 1. Elsewhere in the record, June 10, 2015, is noted as the date of Dr. Gatebe's initial contact with the EEO. ECF No. 25-5 at 1 (Complaint of Discrimination filed with the EEO).

Office of Diversity and Equal Opportunity ("ODEO") accepted the complaint in part, permitting his discrimination claim arising from his non-selection for the management and research positions to proceed. ECF No. 25-11 at 2. Dr. Gatebe's claims for non-selection of the previous seven positions (Experimental Scientist and Atmospheric Science) were dismissed as untimely because Dr. Gatebe had not contacted the EEO within 45 days of the alleged discriminatory actions. *Id.* Dr. Gatebe's hostile work environment and retaliation claims were dismissed because the agency determined that NASA was not Dr. Gatebe's employer. *Id.* at 3.

On October 19, 2017, ODEO issued a Final Agency Decision on Dr. Gatebe's non-selection claims. ECF No. 25-31. The agency determined that Dr. Gatebe satisfied his *prima facie* burden of proof, but that management proffered a legitimate, non-discriminatory reason for his non-selection. *Id.* at 9–10. The agency then found that Dr. Gatebe failed to prove that management's reasons were pretextual, as Ms. Hansen was well-qualified and Dr. Gatebe provided no proof that he was better qualified than Dr. Feldman. *Id.* at 11–12. The Final Agency Decision provided Dr. Gatebe with the right to sue within ninety days of receipt of the decision. *Id.* at 2.

On January 19, 2018, Dr. Gatebe filed this action. ECF No. 1. NASA subsequently moved to dismiss, or alternatively, for summary Judgment. ECF No. 25.

## II.     Standard of Review

Because the parties have submitted evidence outside the four corners of the Complaint and have been given reasonable opportunity to present all pertinent material, the Court will treat the motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d). Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material

fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In responding to a proper motion for summary judgment," the opposing party "must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub nom. Venugopal v. Shire Labs., Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23)). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Where a party's statement of a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court credits the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although formal discovery has not yet taken place, Dr. Gatebe did not file an affidavit pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. The purpose of this affidavit is to ascertain what additional discovery is needed for the non-movant to challenge adequately a summary judgment motion. *See* Fed. R. Civ. P. 56(d). "The Fourth Circuit places 'great weight' on the affidavit requirement." *Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F. Supp. 2d 674, 683 (D. Md. 2013) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." *Harrods Ltd. V. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). Courts place

greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." *Id.* (quoting 10B Wright, Miller & Kane, *Federal Practice & Procedure* § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

To the extent the Court determines that the claims survive challenge at this stage, the Court will permit further discovery. That the Court construes NASA's motion as one for summary judgment does not preclude further discovery or a subsequent round of summary judgment motions, based on additional evidence, after the close of discovery. *See Chaplick v. Mao*, No. TDC-13-2070, 2016 WL 4516061, at *4 (D. Md. Aug. 25, 2016).

### III.    Analysis

### A.    NASA as Joint Employer

As an initial matter, NASA contends that dismissal is warranted as to the retaliation and hostile work environment claims because it was not Dr. Gatebe's employer within the meaning of Title VII. To give full effect to Title VII's "'broad, remedial purpose,' courts have taken a functional approach to the definition of 'employer,'" focusing on the degree of control exerted by the claimed employer over the employee's work. *German v. Akal Sec., Inc.*, No. CCB-11-1242, 2011 WL 5974619, at *7 (D. Md. Nov. 29, 2011) (quoting *Magnuson v. Peak Tech. Servs.*, 808 F. Supp. 500, 507–08 (E.D. Va. 1992)). In determining whether NASA was a joint employer with USRA as to Dr. Gatebe, the Court considers the following non-exhaustive factors:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

*Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 414 (4th Cir. 2015). While no one factor of this analysis is dispositive, three factors are considered most significant to the "joint employer" determination: the power to hire and fire the employee, daily supervision of the employee, and where and how the work takes place. *Id.* at 414–15. "The basis for the finding that two companies are 'joint employers' is that 'one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.'" *Id.* at 408 (quoting *Torres-Negron v. Merck & Co.*, 488 F.3d 34, 40 n.6 (1st Cir. 2007)). The test is "highly fact-specific" to allow "for the broadest possible set of considerations in making a determination of which entity is an employer." *Butler*, 793 F.3d at 413–15.

Construing the current record most favorably to Dr. Gatebe as the non-moving party, the Court cannot grant summary judgment in NASA's favor. Although Dr. Gatebe's payroll and benefits are provided by USRA, and USRA supervises Dr. Gatebe's work, NASA had to preapprove Dr. Gatebe's qualifications before he could begin working on the NASA/USRA joint venture. *Id.* ¶ 32. Additionally, Dr. Gatebe works exclusively on-site at NASA and has his own office at the NASA Goddard Space Flight Center. *Id.* ¶¶ 41–42. NASA assigns work to Dr. Gatebe and has dedicated personnel to ensure that Dr. Gatebe's work is in line with NASA goals. *Id.* ¶ 33; ECF No. 25-8 at 1. Dr. Gatebe routinely collaborates with direct employees of NASA (ECF No. 25-8 at 1) and provides written reports on his work that NASA collects. ECF No. 11 ¶ 38. Because a trier of fact could determine that NASA and USRA jointly employed Dr. Gatebe, summary judgment is denied on this ground.

### B. Exhaustion as to the 2009–2013 non-selections

NASA next contends that the non-selection for the first seven positions and the incidents with Mr. Cahalan, all of which took place between 2009 and 2013, are time-barred. Dr. Gatebe responds that each action was part of a continuing violation, and so the claims are timely. ECF No. 28 at 23–24.

Before filing suit, plaintiffs alleging discrimination under Title VII must exhaust administrative remedies. *McCray v. Md. Dep't of Transportation*, 662 F. App'x 221, 224 (4th Cir. 2016); *Manga v. Knox*, No. ELH-17-1207, 2018 WL 3239483, at *7 (D. Md. July 3, 2018). Federal employees "must consult a[n Equal Employment Opportunity] Counselor prior to filing a complaint . . . within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. 1614.105(a)(1). If administrative remedies are not exhausted for a discrete act prior to the limitations period, such acts "cannot be used as a basis for recovery." *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007). However, acts that fall within a continuing violation can still comprise part of the claim if a part of the claim occurred within the filing period. *E.E.O.C. v. Phase 2 Invs., Inc.*, 310 F. Supp. 3d 550, 575 (D. Md. 2018).

The line between discrete discriminatory acts and continuing violations "can be difficult to discern." *Id.* In a case where an employee was denied career opportunities on four separate occasions, *Morgan v. Nat'l R.R. Passenger Corp.*, 232 F.3d 1008, 1016 (9th Cir. 2000), *aff'd in part, rev'd in part*, 536 U.S. 101 (2002), the Supreme Court of the United States held that each failure to promote was a discrete act. *Morgan*, 536 U.S. at 114. Thus, where non-selection occurs before the filing period, it is not actionable, although the time-barred non-selection may be relevant and admissible evidence in the surviving claims. *See id.* at 113.

Following *Morgan,* Dr. Gatebe's claims for non-selection between 2009–2013 are time-

barred and do not survive "merely because the plaintiff asserts that such discrete acts occurred as part of a policy of discrimination." *Williams v. Giant Food, Inc.*, 370 F.3d 423, 429 (4th Cir. 2004). That said, because the Court will allow Dr. Gatebe's 2015 claims to proceed in part as more fully discussed below, the prior non-selections may be explored in discovery.

## C.    2015 non-selection claims

NASA argues that summary judgment should be granted on Dr. Gatebe's remaining non-selection claims because NASA had a legitimate, non-discriminatory reason for not selecting Dr. Gatebe and Dr. Gatebe failed to prove that reason is pretextual. ECF No. 25-2 at 4.[3] Because Dr. Gatebe has not marshalled any direct evidence of discrimination, the Court evaluates his claims using the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Stoyanov v. Mabus*, 126 F. Supp. 3d 531, 541 (D. Md. 2015). Dr. Gatebe first must establish a *prima facie* case of discrimination by demonstrating that (1) he is a member of a protected group, (2) he applied for the position in question, (3) he was qualified for the position, and (4) NASA rejected his application under circumstances giving rise to an inference of unlawful discrimination. *See Moore v. Mukasey*, 305 F. App'x 111, 115 (4th Cir. 2008).

If Dr. Gatebe establishes his *prima facie* case, the burden shifts to NASA to offer a legitimate, non-discriminatory reason for his non-selection. *See Langerman v. Thompson*, 155 F. Supp. 2d 490, 496 (D. Md. 2001). If NASA provides such a reason, the burden then shifts back to Dr. Gatebe to raise a genuine dispute as to whether NASA's proffered reason is mere pretext for discrimination. *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001);

---

[3] Dr. Gatebe alleges employment discrimination in contravention of 42 U.S.C. § 2000e-16, which covers federal employees. Courts treat violations of § 2000e-16 as comparable to violations of 42 U.S.C. § 2000e-2(a), which reaches discrimination claims against private employers. *Bauer v. Lynch*, 812 F.3d 340, 345 n.3 (4th Cir. 2016) (noting that the liability standards governing private employment are applicable to federal employment). Likewise, retaliation claims are treated comparably whether brought against federal or private employers. *Cardwell v. Johnson*, 289 F. App'x 579, 592 (4th Cir. 2008). This Court, therefore, will rely on such authority interchangeably.

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). Although the framework "involves a shifting back and forth of the evidentiary burden, Plaintiff, at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of" the law. *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 841 (D. Md. 2004); *see also Moore*, 305 F. App'x at 115. "The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995); *see also Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 528 (W.D.N.C. 2015) ("[I]t is not the Court's province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" the non-promotion) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)) (internal alterations omitted).

Dr. Gatebe has established a *prima facie* case of non-selection. Dr. Gatebe, as an African American, is a member of a protected group. *See Gbenoba v. Montgomery Cty. Dep't of Health & Human Servs.*, 209 F. Supp. 2d 572, 576 (D. Md. 2002). It is undisputed that Dr. Gatebe applied for both the management and research positions. ECF No. 11 ¶¶ 45, 48; ECF No. 25-2 at 2. Dr. Gatebe demonstrated his *prima facie* qualification for the positions, given that the Office of Human Capital Management, in consultation with subject matter experts, determined that Dr. Gatebe was sufficiently qualified for an interview. Finally, Dr. Gatebe has demonstrated circumstances giving rise to an inference of unlawful discrimination because both positions were offered to people outside of his protected group. *Gbenoba*, 209 F. Supp. 2d at 576.

Thus, the burden of production shifts to NASA to offer a legitimate, non-discriminatory reason why the positions were not offered to Dr. Gatebe. For both positions, NASA has proffered that the selectee was more qualified than Dr. Gatebe. ECF No. 25-2 at 29, 33. At this

stage, the Court may not engage in credibility assessments. *Moore*, 305 F. App'x at 115. NASA "need only articulate 'reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Because the selectees' stronger qualifications are a legitimate, non-discriminatory justification for Dr. Gatebe's non-selection, NASA has met its burden.

Accordingly, to survive summary judgment, Dr. Gatebe must raise a genuine dispute as to whether NASA's reliance on the selectees' qualifications is mere pretext for discrimination. A plaintiff "can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006).

For the management position, Dr. Gatebe "cannot rely upon his qualifications to establish pretext because he has not presented evidence that would allow a reasonable jury to conclude that he was better qualified than" Ms. Hansen. *See Moore*, 305 F. App'x at 116. The management position required the selectee to "streamline aircraft-based Earth science missions and operations, and provide overall direction and strategy to projects, instruments, and the WFF aircraft office." ECF No. 25-13 at 2. Ms. Hansen had previously managed eight campaigns, each with three to five instruments. ECF No. 25-18 at 4. In contrast, Dr. Gatebe has worked on projects involving a single instrument at a time. ECF No. 25-30 at 4. Nor does his management of other scientists demonstrate that Dr. Gatebe was more qualified than Ms. Hansen, who had supervised multi-year, complex, and coordinated campaigns. ECF No. 25-18 at 4. Based on the record evidence, no rational fact-finder could conclude that Dr. Gatebe was better qualified for the management position than Ms. Hansen.

The Court similarly cannot discern any circumstantial evidence, viewed most favorably to Dr. Gatebe, that allows a plausible inference that the stated reasons for selecting Ms. Hansen were a pretext for race discrimination. The hiring process involved four different panelists, all of whom prepared for the interviews, provided input on the candidates, and agreed that Ms. Hansen was the top candidate. Additionally, each candidate was asked the same questions, responses to which were memorialized and support the panel's unanimous decision.

Attempting to generate a genuine issue of disputed fact, Dr. Gatebe contends that an inference of discrimination may be drawn from the Earth Sciences Division's failure to promote an African American to senior management staff in the last twenty years, and, in a different laboratory than the management position, that only one African American has become a physical scientist. ECF No. 25-30 at 9. Although statistics generally may provide relevant evidence of pretext, *see Woods v. City of Greensboro*, 855 F.3d 639, 648–49 (4th Cir. 2017), Dr. Gatebe's proffer falls short. This is because Dr. Gatebe offers no additional information that supports an inference of discrimination from the dearth of African Americans in management positions.

Dr. Gatebe, for example, does not aver any further detail as to how many senior management and physical scientist vacancies have been filled in the last twenty years, how many African American applicants sought to fill those positions, or how many comparators were selected. ECF No. 28 at 12. Nor does Dr. Gatebe use proxy data to describe the applicant pool. *See Brown v. Nucor Corp.*, 785 F.3d 895, 904–06 (4th Cir. 2015). This is so even though Dr. Gatebe has been working intimately on NASA collaborative projects for much of this twenty-year period.

As a result, the trier of fact is given no context by which it could reasonably conclude NASA has failed to promote African Americans for discriminatory reasons. Given the strength

of Ms. Hansen's credentials, a reasonable jury could not rely upon the single averred fact, even if true, as evidence of pretext. *See Carter v. Ball*, 33 F.3d 450, 455 (4th Cir. 1994) ("In a case of discrimination in hiring or promoting, the relevant comparison is between the percentage of minority employees and the percentage of potential minority applicants in the qualified labor pool."); *Foster v. Tandy Corp.*, 848 F.2d 184 (Table), 1987 WL 46367, at *5 (4th Cir. 1987) (finding no evidence of discrimination where statistics only showed the number of black employees without "describ[ing] the pool of qualified black applicants from which [employer] could have hired").[4] Absent any additional evidence of discrimination, Dr. Gatebe impermissibly asks the trier of fact to second-guess employment decisions as a "super personnel department." *Langerman*, 155 F. Supp. 2d at 500 (quoting *Mackey v. Shalala*, 43 F. Supp. 2d 559, 567 (D. Md. 1999)) (internal quotation marks omitted). Accordingly, Dr. Gatebe's claim of non-selection for the management position cannot go forward. Summary Judgment is granted in NASA's favor as to this claim.[5]

The research position is a different matter. Unlike the management position, the selection process for the research position was dominated by one individual—Dr. Oreopoulos— who allegedly told Dr. Gatebe that he had preselected a candidate for the position. ECF No. 25-30 at 11. While preselection alone does not establish pretext, *Moore*, 305 F. App'x at 117, a reasonable jury could find such pre-selection undermines NASA's assertions of legitimate non-

___

[4] Dr. Irons' statement that "no merit reason" supported the selection decision (ECF. No 11 ¶ 53) does not change the analysis. Viewed most favorably to Dr. Gatebe, this offhanded comment does not undermine Ms. Hansen's comparatively stronger qualifications for managing large scale projects. The fact remains that the selection panelists contemporaneously documented merit-based reasons for the decision which comported with the job requirements.

[5] Despite Dr. Gatebe's assertions at the hearing that more discovery is warranted regarding the management position, Dr. Gatebe could not proffer any specific discovery that possibly could create a genuine issue of material fact, other than deposing the decision-makers to ask "follow up question[s]" and "press[] one more time to really find what was behind the selection." Dr. Gatebe's request for additional discovery on this claim, therefore, is denied. *Evans*, 80 F.3d at 962 (requests for discovery "cannot be conclusory"). The current record on Dr. Gatebe's and Ms. Hanson's qualifications, as well as the selection process, is sufficiently robust, and the Court cannot discern how additional discovery would change the outcome.

discriminatory reasons for the selection.

Dr. Oreopoulos largely controlled the interview and the outcome. One of the three panelists, Dr. Krotkov, was not involved at all after the interview, did not keep contemporaneous notes, and did not know why Dr. Feldman had been selected. ECF No. 25-25 at 2–3. Additionally, Dr. Oreopoulos based his decision, in part, on subjective factors such as the candidates' "potential for excellence." ECF No. 25-24 at 4; *see Page v. Bolger*, 645 F.2d 227, 230 (4th Cir. 1981) (stating that a trial court may apply "particularly close scrutiny" to subjective hiring criteria). As for apparent objective criteria, Dr. Oreopoulos appears to have applied two different standards: one for Dr. Feldman and one for Dr. Gatebe. According to Dr. Oreopoulos, Dr. Gatebe's candidacy was undercut by the "modest" number of citations to three of his published papers. ECF No. 25-24 at 6–7. Yet, Dr. Oreopoulos did not reference the number of citations received on any paper by Dr. Feldman. *See* ECF No. 25-24 at 4. Dr. Gatebe also contends that Dr. Oreopoulos warned Dr. Gatebe as to the negative consequences of complaining to the EEO—the agency tasked with rooting out discrimination in the workplace—of his non-selection. If Dr. Gatebe is believed, then a factfinder could infer plausibly that Dr. Oreopoulos discouraged Dr. Gatebe from complaining to the EEO so to prevent the agency from learning about a selection process influenced by discriminatory animus. ECF No. 11 ¶ 61.

In addition, NASA's failure to fill the position after Dr. Feldman turned down the offer, at this stage, supports a fair inference of pretext. *See Bowie v. Ashcroft*, 283 F. Supp. 2d 25, 31 n.4 (D.D.C. 2003) (noting that "depending on the underlying motivation," failure to fill a position may constitute an adverse employment action). This is because, although Dr. Oreopoulos asserts that the position was not filled due to a lack of qualified candidates (ECF No. 25-24 at 7), NASA's Office of Human Capital Management, in conjunction with a subject matter

expert, found Dr. Gatebe to be sufficiently qualified for the position to receive a final stage interview. The record also reflects that Dr. Gatebe has acquired substantial experience in radiation research. ECF No. 25-26 at 5. Viewing the record most favorably to Dr. Gatebe, the Court cannot conclude as a matter of law that NASA's proffered reasons for not selecting Dr. Gatebe were not pretextual. Summary judgment is denied as to the research position.

### D. Retaliation

Dr. Gatebe's retaliation claim is governed by the same burden-shifting framework as his discriminatory non-selection claim. *See Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). If a plaintiff makes a *prima facie* retaliation claim, the burden then shifts to the defendant "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* at 328 (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)). The plaintiff must then rebut the defendant's evidence by demonstrating the purported reason was pretextual. *Strothers*, 895 F.3d at 328. To make out a *prima facie* case of retaliation, Dr. Gatebe must demonstrate that: (1) he engaged in protected activity, (2) NASA took an adverse action against him, and (3) a causal link exists between the two. *Id.* at 327; *Rhoads v. FDIC*, 257 F.3d 373, 391–92 (4th Cir. 2001).

Dr. Gatebe first contacted the EEO in June of 2015. ECF No. 25-5 at 1. Accordingly, the Court confines the retaliation claim to NASA's actions taken after Dr. Gatebe contacted the EEO in June 2015. *See Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006). Dr. Gatebe alleges that within two weeks of contacting the EEO, Drs. Oreopoulos and Platnick told Dr. Gatebe that he should not have gone to the EEO and implied that his career at NASA would be detrimentally impacted by his EEO involvement. ECF No. 11 ¶¶ 61–62. The Court finds that such statements could reasonably be found to be an adverse action supporting a

retaliation claim.

The retaliation provision in Title VII is designed to promote unfettered access to the statute's remedial process. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Adverse actions in the retaliation context are thus broader than those sufficient to support a substantive discrimination claim. Where a plaintiff must demonstrate change in employment status to satisfy the adverse action prong of the substantive discrimination claim, for retaliation, an action is adverse simply if it "dissuades a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.D.C. 2006)) (internal quotation marks omitted).

This distinction recently animated the court's decision in *Coles v. Deltaville Boatyard, LLC*, No. 3:10cv491-DWD, 2011 WL 4804871 (E.D. Va. Oct. 11, 2011). There, the claimed adverse action was confined to the defendant former employer informing the new employer about the pending EEOC claim against the former employer. *Id.* at *3 (former employer stating, "I hope [the employee] doesn't do to you what he did to me," and "I hope you don't get in the same trouble I'm in."). In allowing the retaliation claim to proceed, the court found that the former employer's conduct would dissuade a reasonable employee from filing an EEOC charge. *Id.* at 6. The court also found that "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" were proper related damages. *Id.* at *8 (quoting *Gnadt v. Castro*, No. 95-1369, 1997 WL 381879, at * 10 (4th Cir. July 10, 1997)) (internal quotation marks omitted).[6]

Here, Drs. Oreopoulos and Platnick's comments to Dr. Gatebe are similarly adverse.

---

[6] The EEOC similarly has allowed retaliation claims to proceed on identical statements as those averred in this case. *Williams v. McHugh*, EEOC DOC 0120090596, 2011 WL 1690815, at *4 (EEOC Apr. 29, 2011); *Binseel v. Caldera*, EEOC DOC 05970584, 1998 WL 730929, at *2 (EEOC Oct. 8, 1998); *see also White*, 548 U.S. at 65–66 (analyzing EEOC interpretations of Title VII retaliation).

Collectively, such comments from the supervisory staff responsible for determining Dr. Gatebe's professional advancement could dissuade a reasonable employee in Dr. Gatebe's shoes from participating further in the EEO process. Dr. Gatebe likewise proffers legally cognizable damages to include emotional pain and suffering.[7] Summary judgment in NASA's favor on these claims must be denied.

### E. Hostile Work Environment

To succeed on a Title VII hostile work environment claim, a plaintiff must establish that he experienced (1) unwelcome conduct, (2) on account of his race, (3) that was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment, and (4) the conduct is imputable to the employer. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001). "[H]arassment need not be accompanied by a contemporaneous statement of animus to be actionable under Title VII—rather, the connection between animus and conduct may be inferred from the totality of the circumstances." *Strothers*, 895 F.3d at 330–31. Courts must apply "common sense" and "appropriate sensitivity to social context" to the "constellation of surrounding circumstances" to determine whether a plaintiff was subject to unwelcome conduct based on race. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

Viewing the record most favorably to Dr. Gatebe, he has failed to demonstrate that NASA's actions were sufficiently severe or pervasive to constitute an abusive work environment. In support of this claim, Dr. Gatebe points the Court to Mr. Cahalan yelling at him once, forcing him to make unnecessary changes in a journal paper, and sending a "threatening" email. ECF No. 11 ¶¶ 63–65. Initially, the Court notes that the claimed conduct occurred in

---

[7] At the hearing, Dr. Gatebe also proffered as damages that after complaining to the EEO, he was subsequently denied further employment opportunities with NASA. The Court expects these matters to be more fully explored in discovery.

2011, well beyond the limitations period for bringing a hostile work environment action. *Manga*, 2018 WL 3239483, at *7. However, even if the Court considered the conduct falling outside the limitations period, *see Gilliam*, 474 F.3d at 140, the conduct is not severe or pervasive enough to support a hostile work environment claim. Mr. Cahalan's email, for example, does not threaten Dr. Gatebe in any way. Rather, the email, read most favorably to Dr. Gatebe, reflects a disagreement between the two gentlemen. Moreover, nothing in the record shows that Dr. Gatebe's unpleasant exchanges with Mr. Cahalan altered Dr. Gatebe's work environment. Important to this analysis is that "[c]allous behavior" or a "routine difference of opinion and personality conflict" do not rise to the level of actionable harassment. *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 599 (D. Md. 2018) (quoting *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000)). As such, the claimed harassment was not sufficiently pervasive or severe to change the conditions of Dr. Gatebe's employment.

Nor will the Court permit Dr. Gatebe to bootstrap the non-selection claims as part of his asserted harassment claim. *See O'Neal v. Harrison*, No. 5:14-CV-198-FL, 2015 WL 1084321, at *7 n.5 (E.D.N.C. Mar. 11, 2015). A majority of the non-selection claims, at present, could only support a hostile work environment claim through a chain of hypothetical inferences not articulated by Dr. Gatebe. The sole surviving 2015 non-selection claim, involving Dr. Oreopoulos, is not sufficiently severe or pervasive to alter Dr. Gatebe's work environment, even when considered alongside the disagreements with Mr. Cahalan from four years prior. *See Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 164 (D.D.C. 2007) ("[A]lleged acts of disparate treatment cannot be transformed, without more, into a hostile work environment claim."); *Jackson v. Maryland*, 171 F. Supp. 2d 532, 542 (finding no hostile work environment where the

"alleged incidents occurred sporadically over a long period of time"). The Court therefore dismisses the claim, but without prejudice. Should discovery produce sufficient facts supporting a timely hostile work environment claim, the Court will entertain a motion to amend the Complaint accordingly.[8]

## IV.     Conclusion

For the foregoing reasons, NASA's motion to dismiss, or alternatively, for summary judgment is granted in part and denied in part. A separate Order follows.

November 29, 2018_____                                    ____/S/_____
Date                                                                                            Paula Xinis
                                                                                                  United States District Judge

---

[8]  The Court recognizes that it has construed NASA's motion as one for summary judgment. The Court, however, equally recognizes that formal discovery has not yet taken place. Accordingly, the Court dismisses this claim so that, as unlikely as it may be, to the extent discovery generates sufficient evidence to sustain a hostile work environment claim, Dr. Gatebe will be granted leave to amend. The Court will set a deadline in the scheduling Order for amending in this respect.