## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHARLES K. GATEBE,          *

      Plaintiff,             *

      v.                   *        Civil Action No. 8:18-cv-00182-PX

BILL NELSON,            *
Administrator,
National Aeronautics and Space    *
Administration (NASA)
                        *
      Defendant.          *
                      ***

## MEMORANDUM OPINION

Pending before the Court in this employment discrimination suit is the National Aeronautics and Space Administration ("NASA")'s motion to dismiss or, alternatively, for summary judgment.  ECF No. 76.[1]  After full briefing and a hearing, and for the following reasons, the motion is GRANTED.

### I.    Background[2]

Plaintiff Dr. Charles K. Gatebe ("Dr. Gatebe"), an African American man, has worked as a research scientist with NASA for many years.  *See* ECF No. 76-11; ECF No. 76-51 at 6–7.  He holds a master's degree in meteorology and a Ph.D. in atmospheric physics, both with honors.  *See* ECF No. 76-11 at 4–5.  He is well published in his field.  *See id.* at 5–7.

In October 2000, the University of Maryland, Baltimore County hired Dr. Gatebe as an Associate Research Scientist, and he was placed at NASA through a cooperative agreement

---

[1] The named defendant, current NASA Administrator Bill Nelson, is sued in his official capacity on behalf of NASA.  The opinion throughout will refer to the defendant as "NASA" or "the Agency."

[2] Unless otherwise noted, the facts recounted below are undisputed and construed most favorably to Dr. Gatebe as the non-moving party.  *See News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 364 n.3 (D. Md. 2011).

between the two organizations.  *See* ECF No. 76-35 at 2–3.  His research laboratory was physically located at NASA's Goddard Space Flight Center in Greenbelt, Maryland ("NASA Goddard").  *See* ECF No. 77-4 at 8.  In May 2011, Dr. Gatebe transferred to the Universities Space Research Association ("USRA") as an Associate Research Scientist but remained at NASA Goddard through a similar arrangement.  *See* ECF No. 76-4 at 1; ECF No. 76-6.

Since 2009, Dr. Gatebe has tried unsuccessfully to work directly for NASA.  He has applied and been rejected for at least ten NASA positions.  *See* ECF No. 38 at 2; ECF No. 62. This case focuses on two such positions, both within NASA Goddard's Earth Sciences Division. One was with the Climate and Radiation Laboratory and the other with the Hydrological Sciences Laboratory.  Dr. Gatebe contends that his race motivated the non-selection both times. ECF No. 62 ¶ 85.  He further alleges that NASA refused to hire him for the Hydrological Sciences Laboratory position in retaliation for his having complained of racial discrimination in the workplace.  *See id.* ¶ 100.  The facts surrounding the open positions and NASA's selection process are discussed separately below.

**A.  Climate and Radiation Position**

In 2015, Dr. Gatebe applied for the vacant position of Research Physical Scientist, AST, Climate and Radiation Studies (the "Climate and Radiation" position).  For this position, NASA needed an individual who could perform "highly complex and difficult data analysis and simulation" involving "highly specialized radiative transfer alogrithms[] and numerical computer programs that predict weather and climate."  *See* ECF No. 76-9 at 2.  The position description solicited applicants with "specialized experience" in "employing radiative transfer models for remote sensing and climate or weather predictions; developing new data analysis techniques, instruments, and simulation of measurements for current and future NASA Earth Science

missions; and analyzing data from satellite aircraft or ground-based observations to study the effects of atmospheric radiation on Earth systems." *Id.*

Dr. Lazaros Oreopoulos ("Dr. Oreopoulos"), Chief of the Climate and Radiation Laboratory, was the "selecting official" for this position. *See* ECF No. 76-12 at 2. Dr. Oreopoulos first worked with NASA's Office of Human Capital Management to create a vacancy announcement that was publicly posted to USAJOBS.gov. *See* ECF No. 76-13 at 10–11; ECF No. 76-24. He next emailed the laboratory staff to inform them of the vacancy. *See* ECF No. 77-4 at 72.

Dr. Gatebe, who was already working in the Climate and Radiation Laboratory as part of the USRA cooperative agreement, "wanted to join the civil service" and believed the position "matched exactly [his] qualifications." *See* ECF No. 77-4 at 70. He immediately reached out to Dr. Oreopoulos to express his interest. *Id.* at 70–73. Shortly after, the two met to discuss Dr. Gatebe's candidacy. *Id.*

Dr. Gatebe recalls Dr. Oreopoulos sharing that he already "had somebody in mind" and intimating that the selection process would be a mere formality, but he nonetheless encouraged Dr. Gatebe to apply. *See* ECF No. 77-4 at 72–73. Dr. Oreopoulos, in contrast, recalls saying only that "some" applications "may come from candidates with stronger qualifications than [Dr. Gatebe]," and that because no applications had been submitted at the time he met with Dr. Gatebe, he could not possibly have known who he would select. *See* ECF No. 76-12 at 7. Dr. Oreopoulos admits, however, that he "was hoping" Dr. Daniel Feldman ("Dr. Feldman"), the eventual selectee, would apply for the vacancy. *See* ECF No. 76-13 at 24.

Drs. Gatebe and Feldman, along with 60 other applicants, responded to the vacancy announcement. ECF No. 76-15. NASA, in turn, implemented a three-stage screening process to

3

identify which applicants would appear on the "Certificate of Eligible Candidates" and advance to the interview stage. *See* ECF No. 76-13 at 10–11. As part of the winnowing process, certain applicants were "screened by NASA's automated system," and Dr. Alexander Marshak ("Dr. Marshak") was designated a "subject matter expert" to ascertain which of the remaining candidates possessed the requisite qualifications to advance to interviews. *Id.* at 11 & 13.

After his review, Dr. Marshak presented a certificate of eight eligible candidates to Dr. Oreopoulos. ECF No. 76-13 at 15–16. Dr. Oreopoulos next assembled a hiring committee to review and select from the eight finalists. *Id.* at 12. Dr. Oreopoulos acted as committee chair; he chose Drs. Nickolay Krotkov ("Dr. Krotkov") and Donifan Barahona ("Dr. Barahona") as the committee members. *Id.* at 11–12. Drs. Oreopoulos and Krotkov are white men, and Dr. Barahona is a man of "[m]ixed race of Hispanic background." *See id.* at 9; ECF No. 76-17 at 2; ECF No. 76-18 at 2. The committee scheduled interviews with each of the eight eligible applicants. ECF No. 76-13 at 17.

Dr. Oreopoulos prepared a list of nine subject matter questions to ask each applicant. *See* ECF Nos. 76-20, 76-24. Those questions were used "as a starting point" for discussion, with committee members asking follow on questions responsive to each interviewee. *See* ECF No. 76-13 at 18. Although all three members participated in the interviews, none kept any notes. *See* ECF No. 76-17 at 2; ECF No. 76-18 at 2. Nor were they asked to "score" or "rank" the applicants. *See* ECF No. 76-17 at 2; ECF No. 76-18 at 2.

After the interviews, Dr. Oreopoulos asked Dr. Barahona who he would select for the position, and Dr. Barahona recommended Dr. Feldman. *See* ECF No. 76-18 at 3. Dr. Krotkov, however, was never asked to "recommend any particular candidate," and he never learned who was ultimately selected to fill the vacancy. *See* ECF No. 76-17 at 3. Ultimately, Dr. Oreopoulos

4

made the final hiring decision.  *See* ECF No. 76-13 at 19 ("The panel doesn't make a decision.  I

make a decision.").  On May 26, 2016, Dr. Oreopoulos notified the Office of Human Capital

Management that he had selected Dr. Feldman.  ECF No. 76-22.

Defending his selection, Dr. Oreopoulos emphasized that the Climate and Radiation

Laboratory needed a technical specialist who could perform highly complex data analyses and

simulations involving radiative transfer tools and numerical computer programs that predict

weather and climate.  *See* ECF No. 76-12 at 3–4.  According to Dr. Oreopoulos, Dr. Feldman

had a particularly robust track record of using certain radiative transfer codes to produce

hyperspectral signals.  *See* ECF No. 76-13 at 23–24.  Dr. Oreopoulos viewed Dr. Feldman as a

"radiative transfer guru" whose research in the field of climate change variability aligned

perfectly with the laboratory's needs.  *Id.* at 25.  Dr. Oreopoulos, therefore, felt confident that Dr.

Feldman would have the technical know-how to "go into the heart of [radiative transfer codes],

modify them, [and] create radiative transfer codes from scratch."  *Id.* at 24.  And overall, Dr.

Oreopoulos felt that Dr. Feldman's career was proceeding along an "ascending trajectory" and

that he had demonstrated a true "potential for excellence."  ECF No. 76-12 at 4.

In contrast, Dr. Oreopoulos regarded Dr. Gatebe's experience as less relevant.  *See* ECF

No. 76-12 at 3–4.  While Dr. Feldman "had implemented, developed, or modified radiative

transfer tools in large scale models (weather and climate prediction models) . . . [Dr. Gatebe] had

not."  *Id.* at 3.  Dr. Barahona concurred with Dr. Oreopoulos in this regard.  *See* ECF No. 76-18

at 3 ("[Dr. Feldman] has relevant experience developing and updating radiative transfer codes

within global modeling and satellite data analysis.").  Dr. Oreopoulos also weighed Dr.

Feldman's "qualitatively superior" record of scientific publications against that of Dr. Gatebe's,

which had been "pretty decent, but nothing remarkable."  ECF No. 76-12 at 3–4; ECF No. 76-13

at 31–32.

On May 27, 2015, Dr. Feldman was offered the position and declined.  *See* ECF No. 76-22; ECF No. 76-23.  Because the original certificate of eligible candidates had already expired, the position was "deemed nonfilled," and so none of the other seven eligible applicants could be chosen to fill the spot.  *See* ECF No. 76-13 at 26.  When the position was re-advertised a year later, Dr. Gatebe did not apply.  *See id.*

**B.  Hydrological Sciences Position**

Dr. Gatebe also challenges his non-selection for the position of Research Physical Scientist, AST, Earth Sciences Remote Sensing, which was housed within the Hydrological Sciences Laboratory (the "Hydrological Sciences" position).  The selecting official for this position was Dr. Matthew Rodell ("Dr. Rodell"), Chief of the Hydrological Sciences Laboratory. ECF No. 76-30 at 8.  The selection process for this position was protracted and cumbersome. NASA advertised and re-advertised the position five times.  *Id.* at 7.

Dr. Gatebe initially applied for the position on September 24, 2017, in response to the fourth advertisement.  *See* ECF No. 76-51 at 23; ECF No. 76-27 at 2.  When he was not selected during that round, and the position was not filled, he reapplied on March 3, 2018, in response to the fifth advertisement.  ECF No. 76-51 at 30; ECF No. 76-27 at 3.  Dr. Gatebe challenges only the fifth round non-selection as discriminatory; however, the events giving rise to the fourth round provide important context for the claim.

The Hydrological Sciences position demanded an applicant with expertise in "remote sensing of snow water equivalent and snow depth."  *See* ECF No. 76-30 at 8.  In the fourth round when Dr. Gatebe first applied, only three scientists including Dr. Gatebe were certified as eligible to be interviewed.  *Id.* at 8.  For both rounds, Dr. Rodell commissioned a hiring

6

committee that included Drs. Peggy O'Neill ("Dr. O'Neill"), Alicia Joseph ("Dr. Joseph"), Rajat Bindlish ("Dr. Bindlish"), Edward Kim ("Dr. Kim"), and Sujay Kumar ("Dr. Kumar"). *See id.* at 10. Dr. Rodell highlights that he purposefully selected a diverse interview committee, "both in terms of gender and race." *Id.* at 9. Dr. Rodell is a man of "mixed European" descent; Dr. O'Neill is a white woman; Dr. Joseph is a Caribbean American woman; Dr. Bindlish is a man of "Indian sub-continent descent"; Dr. Kim is an Asian man; and Dr. Kumar is a man "of Indian descent." *See* ECF No. 76-30 at 6 & 13; ECF No. 76-45 at 3; ECF No. 76-49; ECF No. 76-46 at 2; ECF No. 76-48 at 3; ECF No. 76-47 at 2. Each of the committee members reported to Dr. Rodell as their laboratory chief. *See* ECF No. 76-30 at 12.

For the fourth advertisement, the committee conducted telephone interviews with each of the three eligible applicants to determine who should be invited for an in-person interview. ECF No. 76-30 at 8–9. Dr. Rodell supplied the committee members preset questions but also allowed them to ask follow-up questions of the candidates. *Id.* at 9 & 20. All of the committee members retained their notes and participated in the evaluation of the applicants. *See* ECF No. 76-30 at 9; ECF No. 76-45 at 9; ECF No. 76-46 at 5; ECF No. 76-47 at 5–6; ECF No. 76-48 at 5; ECF No. 76-49 at 4.

After the telephone interviews, the hiring committee invited Dr. Gatebe and Dr. Sam Tuttle ("Dr. Tuttle"), a white man, to participate in the final interview round, which included an in-person interview, lunch with the committee, and a seminar presentation open to the entire Earth Sciences Division. *See* ECF No. 76-30 at 9. The committee next checked references. *Id.* at 16–17. After each candidate had completed the final interview round, the committee met and unanimously agreed to offer the Hydrological Sciences position to Dr. Tuttle. *See* ECF No. 76-30 at 9–10.

The committee explained that although they appreciated Dr. Gatebe's leadership on NASA's "SnowEx" project, they were underwhelmed by his relative lack of subject matter experience.  ECF No. 76-30 at 10.  The committee also noted that neither Dr. Gatebe's interview nor his presentation was particularly detailed or noteworthy.  *See, e.g.*, ECF No. 76-40 at 6. Last, the committee highlighted that Dr. Gatebe seemed to view the position as more of a supervisory role than one requiring substantive expertise.  *See* ECF No. 76-30 at 28 ("And his answer was always that he doesn't need to be the expert because he knows where to find the experts.  And what we told him multiple times was . . . [w]e're looking for someone to be the expert . . . .").  As Dr. Rodell explained, Dr. Gatebe simply had not "done research and led research on snow science, snow processes, [or] practical applications remotely sensing snow water equivalent and snow depth."  *See* ECF No. 76-30 at 10.

Dr. Gatebe's division-wide presentation reinforced their concerns, as he did not focus on any "research that he was doing in the area and it was not a technical presentation."  ECF No. 76-49 at 6.  Further, Dr. Gatebe's references shared with the committee that he had made "chauvinistic" comments on the job, and that he was "verbally abusive" and not a "good leader." ECF No. 76-30 at 16–20.

Dr. Tuttle stood apart.  He not only had the technical expertise and gave a substantially superior seminar presentation, but his references had supported his candidacy.  *See* ECF No. 76-30 at 9.  Dr. Tuttle, however, declined the position, and the committee chose not to extend an offer to Dr. Gatebe.  *See id.* at 10.  The position, instead, was re-advertised a fifth time.

In preparation for the fifth round, on February 20, 2018, Dr. Rodell reached out to Dr. Kim to ask if there were any individuals the hiring committee should "target" for invitation to apply.  *See* ECF No. 76-32.  Specifically, Dr. Rodell asked Dr. Kim if there was "anyone else

who caught [his] attention" in addition to those scientists whom the department had courted

before.  *See id.*  Although Dr. Gatebe was not included among the nearly two dozen names that

the committee discussed, the list did include the eventual selectee, Dr. Carrie Vuyovich ("Dr.

Vuyovich").  *See id.*

Also prior to the fifth advertisement, Dr. Gatebe informed Dr. Rodell that he had

previously filed an equal employment opportunity ("EEO") complaint about his non-selection

for the Climate and Radiation position and one other position.  ECF No. 76-51 at 23–24.  Dr.

Gatebe recalls that he shared this information with Dr. Rodell on January 31, 2018, before

responding to the fifth advertisement.  *Id.* at 24.  Dr. Rodell agrees that the conversation took

place, but he believes it happened in July 2018, after the Hydrological Sciences position had

been filled.  *See* ECF No. 76-30 at 6, 29–30 (Dr. Rodell confirming no information as to EEO

activity affected the selection decision).

In any event, Dr. Gatebe applied for this fifth round on March 3, 2018.  ECF No. 76-51 at

30.  Dr. Gatebe was among three eligible candidates, and the only repeat candidate, who

proceeded to the final round.  *See* ECF No. 76-30 at 11.  The other selectees were Dr. Shahriar

Pervez ("Dr. Pervez") and Dr. Vuyovich, a white woman.  *Id.*  Because Dr. Gatebe had already

interviewed during the fourth round, the committee offered him the option of re-answering the

previous questions or simply updating his answers.  *Id.*  Dr. Gatebe chose the latter and

supplemented his earlier responses during a phone call with the committee.  *Id.* at 20.  Dr.

Gatebe described his work developing "a new snow community website" wherein members of

the scientific community could correspond with one another and learn of snow-related news and

informed the committee that he had submitted a paper for publication which discussed measuring

albedo in snow-covered areas.  *Id.*

After the three telephonic interviews were complete, the committee proceeded to an in-person interview with only Dr. Vuyovich.  *See* ECF No. 76-30 at 11.  Dr. Rodell noted to his supervisor that he found Dr. Vuyovich "the strongest of any of the candidates we've interviewed."  ECF No. 76-38.  Of importance to Dr. Rodell, Dr. Vuyovich had written several research funding proposals, held leadership roles in various snow teams, and had relevant publication experience, including working on technical reports for the Army Corps of Engineers.  *See* ECF No. 76-30 at 23.

Other committee members were similarly impressed by Dr. Vuyovich.  Among the accomplishments that distinguished her candidacy, Dr. Vuyovich possessed a civil engineering doctoral degree which is "where most of the land surface hydrologists get their training."  *See* ECF No. 76-45 at 9.  Dr. Vuyovich had also conducted highly technical "microwave snow research," which was more relevant and sophisticated than Dr. Gatebe's prior snow-related research.  *See id.* at 7–9; *see also* ECF No. 76-46 at 7.  Dr. Vuyovich's seminar presentation likewise reflected practical application of her ample education and experience.  *See* ECF No. 76-43.  In short, Dr. Vuyovich appeared to the committee to be well versed in the subject-specific science necessary to do the job.  *See id.* (fielding specific questions to the satisfaction of the committee).

Accordingly, the committee determined that Drs. Pervez and Gatebe were not as qualified as Dr. Vuyovich.  *See* ECF No. 76-30 at 11.  The committee did not grade or rank the three applicants, but it unanimously agreed to recommend Dr. Vuyovich.  *See, e.g.*, ECF No. 76-46 at 8.  Although Dr. Rodell was the selecting official for the position, he needed to secure the concurrence of other senior officials in the Earth Sciences Division before an offer could be extended.  On May 21, 2018, Dr. Rodell emailed those senior officials to notify them that the

10

committee had selected Dr. Vuyovich.  *See* ECF No. 76-44 at 2.  One such senior official was Dr. James Irons ("Dr. Irons"), Deputy Director of the Earth Sciences Division and a supervisor against whom Dr. Gatebe had previously accused of discrimination regarding his non-selection for an unrelated management position.  The next day, Dr. Vuyovich's selection was approved, and she accepted the position.  *See* ECF No. 76-44.

### C.  Equal Employment Opportunity Complaints

During the above-described application processes, Dr. Gatebe formally and informally communicated to many people that he believed his non-selections were race-based.  He met with several supervisors, including Dr. Irons and Dr. Piers Sellers ("Dr. Sellers"), the Acting Director of the Earth Sciences Division, in June of 2015 to discuss his concerns.  *See* ECF No. 76-51 at 17.  He also forwarded by email the same complaints to NASA's EEO counselor.  *See id.* at 17; *see also* ECF No. 76-52.

Dr. Gatebe also informed Dr. Oreopoulos that he intended to file an EEO complaint concerning his non-selection for the Climate and Radiation position.  *See* ECF No. 76-13 at 29–30; ECF No. 76-51 at 17–20.  Dr. Oreopoulos responded that such a complaint "probably won't have merit" because "his non selection had nothing to do with race."  *See* ECF No. 76-13 at 29.  According to Dr. Gatebe, the discussion became heated; Dr. Oreopoulos recalls it remaining professional.  *Compare* ECF No. 76-51 at 18 ("[Dr. Oreopoulos] kind of jerked up and started talking loudly. . . . And then he left the break room and was pacing back and forth, and that to me is usually somebody who is unsettled.") *with* ECF No. 76-13 at 31 ("And I remember it as a friendly discussion where he sought my advice as somebody who has been around there for a while and held a managerial position.").

Dr. Gatebe also shared his intent to pursue an EEO complaint with Dr. Steven Platnick

11

("Dr. Platnick"), another scientist in the Earth Sciences division.  Dr. Platnick cautioned that raising such concerns might jeopardize Dr. Gatebe's career at NASA.  *See* ECF No. 76-51 at 20–21.  Undaunted, Dr. Gatebe met with an EEO counselor on June 18, 2015, and filed his first formal complaint about his non-selection on September 29, 2015.  *See* ECF No. 76-51 at 17. After the Hydrological Sciences non-selection, Dr. Gatebe initiated contact with an EEO counselor on July 30, 2018, and he filed a formal complaint concerning this non-selection on August 31, 2018.  ECF No. 62-1 at 2.

**D.  This Lawsuit**

On January 19, 2018, Dr. Gatebe filed suit in this Court, alleging race-based disparate treatment, retaliation, and hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  ECF No. 1.  Specifically, the original Complaint alleged that nine non-selections, including the Climate and Radiation position, were unlawful.  *See generally* ECF No. 1.[3]  The Agency moved for summary judgment in its favor on all claims.  *See* ECF No. 25.  The Court granted summary judgment on certain non-selection challenges and the hostile work environment claim but denied the motion as to Dr. Gatebe's non-selection for the Climate and Radiation position and the retaliation claim.  *See* ECF Nos. 39 & 41.

On September 3, 2019, the Court granted Dr. Gatebe's motion for leave to file a Second Amended Complaint which added discrimination and retaliation claims related to the Hydrological Sciences position.  *See* ECF Nos. 60–62.  After discovery, the Agency timely moved for dismissal or, alternatively, for summary judgment (ECF No. 76).  For the reasons discussed below, the Court grants NASA's motion.

---

[3] On February 22, 2018, Dr. Gatebe filed a First Amended Complaint, which consisted of "cosmetic, spacing edits."  ECF No. 11 at 2 n.1; *see also* ECF No. 12.

## II.      Standard of Review

The Agency seeks dismissal or alternatively summary judgment on all claims.  ECF No.

76.  "When 'matters outside the pleading are presented to and not excluded by the court, the

12(b)(6) motion shall be treated as one for summary judgment and disposed of as provided in

Rule 56.'"  *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir.

1998) (quoting Fed. R. Civ. P. 12(b)) (internal quotation marks and brackets omitted).

Discovery has closed, and the parties incorporate the record to support their respective positions.

The Court, therefore, treats the pending motion as one for summary judgment.  *See Best v.*

*Tossou*, No. PWG-15-2515, 2016 WL 3257825, at *2 (D. Md. June 14, 2016) ("It is obvious that

the Court may construe a motion that is styled as a 'Motion to Dismiss or, in the Alternative,

Motion for Summary Judgment,' as is the case here, as a motion for summary judgment.").

Summary judgment is appropriate when the Court, construing all evidence and drawing

all reasonable inferences in the light most favorable to the non-moving party, finds no genuine

dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011).

Summary judgment must be granted "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In

responding to a proper motion for summary judgment," the opposing party "must present

evidence of specific facts from which the finder of fact could reasonably find for him or her."

*Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004) (citing *Anderson v. Liberty*

*Lobby*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23).  The Court cannot weigh

evidence or make credibility determinations.  *Id.* at 255 ("Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a

directed verdict.").  But neither must it credit "mere speculation" or the non-movant's attempts to

build "one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008)

(quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).  Where a party's statement of a fact

is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court

credits the record.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    Analysis

### A.   Race-Based Non-Selection Claims

For both challenged positions, Dr. Gatebe maintains that NASA refused to hire him on

account of his race.  "To survive a motion for summary judgment on a Title VII disparate

treatment claim, a plaintiff must either proceed under the mixed-motive framework or the

*McDonnell Douglas* burden-shifting framework."  *Sempowich v. Tactile Sys. Tech., Inc.*, 19

F.4th 643, 649 (4th Cir. 2021).  Dr. Gatebe proceeds under *McDonnell Douglas*.  *See id.*; *see

also* ECF No. 77-1 at 7–9.  Accordingly, Dr. Gatebe first must establish a *prima facie* case of

discrimination by showing that (1) he belongs to a protected class; (2) he applied for and was

qualified for a job for which the employer was seeking applicants; (3) despite his qualifications,

he was rejected; and (4) after the rejection, the position remained open and the employer

continued to seek applicants from persons of his qualifications, or that someone outside of his

protected group was selected for the position.  *See EEOC v. Sears Roebuck*, 243 F.3d 846, 851

(4th Cir. 2001); *Langerman v. Thompson*, 155 F. Supp. 2d 490, 495 (D. Md. 2001).  If he makes

this showing, NASA must then produce evidence of a "legitimate, non-discriminatory reason"

for not selecting him.  *Sears Roebuck*, 243 F.3d at 852.  If NASA so demonstrates, the burden

shifts back to Dr. Gatebe to show that NASA's stated reason was merely pretext for discrimination.

Establishing a *prima facie* case is not onerous. *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). The Agency recognizes as much because it does not meaningfully argue otherwise for both challenged non-selections. *See* ECF No. 76-1 at 28; *see also* ECF No. 91. Dr. Gatebe, an African American, had applied and was qualified for both the Climate and Radiation and Hydrological Sciences positions insofar as he made it far into the selection process for each. Yet NASA chose a white candidate both times, which alone may give rise to an inference of unlawful discrimination. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). *Cf. Burke v. Anne Arundel Med. Ctr.*, No. ELH-14-3019, 2015 WL 2227914, at *3 (D. Md. May 8, 2015) (dismissing lawsuit where plaintiff did not allege that "she was of a different race than those four employees who were not discharged").

The record further demonstrates that NASA has articulated legitimate, nondiscriminatory reasons for not choosing Dr. Gatebe for both vacancies. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) ("[The employer's] burden, however, is a burden of production, not persuasion."). For each, the Agency contends that Drs. Feldman and Vuyovich were simply more qualified than Dr. Gatebe. Accordingly, the dispute centers on whether sufficient evidence exists to demonstrate that "employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Holland*, 487 F.3d at 214 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). For the claims to proceed to trial, some evidence must permit the reasonable inference that the "employer's proffered explanation" for Dr. Gatebe's non-selection is "unworthy of credence," and that the true reason for his rejection had been his race. *Burdine*, 450 U.S. at 256. When viewing the

15

record most favorably to Dr. Gatebe, a rational trier of fact could not reach this conclusion.

For the Climate and Radiation position, Dr. Gatebe highlights that the selection process was less than "rigorous."  *See* ECF No. 76-1 at 8.  Fair enough.  The hiring committee did not take notes during the interviews or check candidates' references.  *See* ECF No. 76-13 at 22 & 25. Further, Dr. Oreopoulos consulted only with one of the two committee members before offering Dr. Feldman the position (ECF No. 76-17 at 3), and he cited amorphous criteria such as "career trajectory" and "potential for excellence" as grounds for his decision (ECF No. 76-13 at 31).  *See Page v. Bolger*, 645 F.2d 227, 230 (4th Cir. 1981) ("[W]hen [the] evaluation is to any degree subjective . . . the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny by the trial judge.").

But a mushy selection process alone does not give rise to an inference that Dr. Gatebe was rejected on account of his race.  No evidence suggests, for example, that Dr. Oreopoulos lied or otherwise did not sincerely hold the belief that Dr. Feldman was the better candidate.  *See, e.g.*, *Nakhid v. Am. Univ.*, No. 21-7107, 2022 WL 2678742, at *2 (D.C. Cir. July 12, 2022) (unpublished decision) ("The question is . . . whether hiring officials sincerely made their decision on [the stated] basis and not on the basis of race.") (citing *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)); *Figueroa v. Geithner*, 711 F. Supp. 2d 562, 574 (D. Md. 2010) ("Although a plaintiff must prove that the adverse employment decision was motivated by discrimination, proof that the proffered reasons were false may serve as circumstantial evidence of such discrimination.").  At best, the record may call into question Dr. Oreopoulos' rigor as a selecting official, but an imperfect process does not amount to proof of discriminatory animus.  *See Scott v. Leavitt*, No. 05-731-RWT, 2007 WL 2156421, at *4 (D. Md. July 23, 2007) ("Plaintiff's opinion as to what should [have] been important for the selection

16

process is immaterial."); *see also Danial v. Morgan State Univ.*, 426 F. Supp. 3d 135, 145–46 (D. Md. 2019); *Evans*, 80 F.3d at 960–61.

Dr. Gatebe relatedly argues that the stated reasons for his non-selection are pretextual because Dr. Oreopoulos had someone "in mind" for the position.  ECF No. 77-1 at 10 & 21. Even if the Court credits that Dr. Oreopoulos had wished to hire Dr. Feldman, this alone does not demonstrate pretext.  Indeed, as the United States Court of Appeals for the Fourth Circuit makes clear, preselection of one applicant is unfair to *all* of the other applicants, regardless of race.  *See Blue v. U.S. Dep't of Army*, 914 F.2d 525, 541 (4th Cir. 1990) ("If one employee was unfairly preselected for the position, the preselection would work to the detriment of all applicants for the job, black and white alike."); *see also Williams v. Carolina Healthcare Sys., Inc.*, 452 F. App'x 392, 394 (4th Cir. 2011) (unpublished decision) ("[T]hough the promoted employee was preselected for the position, preselection does not, in itself, demonstrate racial discrimination."). Although preselection may give rise to an inference of discrimination in some instances, such an inference is not automatic, and it must be based on the totality of the evidence.  *See Ham v. Washington Suburban Sanitary Comm'n*, 158 F. App'x 457, 470 (4th Cir. 2005) (unpublished decision); *see also Moore v. Mukasey*, 305 F. App'x 111, 119 (4th Cir. 2008) (Gregory, J., dissenting) (unpublished decision) ("Of course, preselection, however unfair it may be, does not by itself suffice to prove racial discrimination.").

That said, when viewing the record in Dr. Gatebe's favor, nothing demonstrates Dr. Oreopoulos had chosen Dr. Feldman—and not Dr. Gatebe—in advance of the interview process. Sixty-two applicants were first screened through an automated process for requisite job and educational bona fides.  Next, an independent subject matter expert selected the finalists for interviews.  *See* ECF No. 76-12 at 2; ECF No. 76-13 at 11; ECF No. 76-15.  Dr. Oreopoulos had

no knowledge about, or input on, who advanced to the final interview phase.  ECF No. 76-13 at

11.  From this, no reasonable juror could infer that Dr. Oreopoulos had, in fact, preselected Dr.

Feldman, and certainly not in a manner suggesting Dr. Gatebe had been rejected on account of

his race.  Without evidence to suggest the reasons for Dr. Gatebe's non-selection were

pretextual, NASA's summary judgment motion must be granted.

Likewise, for the Hydrological Sciences position, Dr. Gatebe contends that he was

superiorly more qualified than Dr. Vuyovich; however, the committee unanimously agreed that

Dr. Vuyovich's comparatively deeper experience with snow climatology made her the top

candidate for the position.  *See, e.g.*, ECF No. 76-45 at 10; ECF No. 76-48 at 7; ECF Nos. 76-40

& 76-43.  In particular, the committee valued Dr. Vuyovich's experience writing research

proposals and scientific publications, her leadership abilities and educational background, and

her demonstrated ability to conduct the snow-related research relevant to the job.  *See* ECF No.

76-30; ECF No. 76-45 at 7–9.  No record evidence undermines that the stated reasons for

choosing Dr. Vuyovich over Dr. Gatebe were the true ones.  Because a rational juror could not

infer non-selection of the plaintiff on account of his race, summary judgment must be granted on

this claim as well.  *See Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008).

### B.  Retaliation

Lastly, the Court turns to Dr. Gatebe's retaliation claim as to the Hydrological Sciences

position.[4]  Just as Title VII prohibits employers from discriminating on the basis of race, it

likewise prohibits employers from retaliating against an employee who avails himself of Title

---

[4] In the Amended Complaint, Dr. Gatebe asserts that his non-selection for both the Climate and Radiation and Hydrological Sciences positions were retaliatory.  ECF No. 62.  But as the Agency correctly notes, Dr. Oreopoulos had no knowledge of Dr. Gatebe's EEO activity until two weeks *after* Dr. Oreopoulos had selected Dr. Feldman for the Climate and Radiation position, and so, the activity could not have influenced Dr. Oreopoulos' decision.  Through counsel, Dr. Gatebe has conceded this point.  *See* ECF No. 91 (agreeing that the retaliation claim concerns only the Hydrological Sciences position).  Summary judgment is therefore granted in the Agency's favor as to the retaliation claim involving the Climate and Radiation non-selection.

VII's protections.  *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019).  With respect to the *prima facie* case of retaliation, Dr. Gatebe must show that (1) he engaged in protected activity by either participating in a Title VII proceeding or opposing his employer's discriminatory practices; (2) the employer took a materially adverse action against him; and (3) a causal connection exists between the protected activity and the adverse action.  *Id.*

NASA does not dispute that Dr. Gatebe clearly participated in protected EEO activity and that his non-selection constitutes an adverse employment action.  *See Vedula v. Azar*, No. TDC-18-0386, 2020 WL 5500279, at *13 (D. Md. Sept. 11, 2020) (noting that non-selection for a vacant position constitutes a materially adverse action for purposes of a retaliation claim).  As for the causal connection, Dr. Gatebe relies solely on the temporal proximity between disclosing his protected activity and not receiving the job.[5]  Although he is correct that in certain circumstances, temporal proximity may be sufficient to survive summary judgment, that is not always the case.  *See Sempowich*, 19 F.4th at 654; *see also Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("[T]emporal proximity between a complaint and an adverse employment action can, *in some cases*, be used to survive summary judgment . . . .") (emphasis added).  As the Fourth Circuit has made clear, a plaintiff cannot rest solely on temporal proximity where "[t]he actions that led to" the adverse action began before the plaintiff engaged in the "protected activity."  *Francis*, 452 F.3d at 309.  Put differently, where the "timing

---

[5] Even though disputed, the Court accepts as true Dr. Gatebe's testimony that he told Dr. Rodell about his protected activity between the fourth and fifth round selections.  *Compare* ECF No. 76-30 at 6 (stating that Dr. Gatebe mentioned his EEO activity in July 2018) *with* ECF No. 76-51 at 26 (stating that the same conversation occurred in January 2018).  Also, Dr. Irons, the Deputy Director of the Earth Sciences Division, who ultimately needed to "concur" with the hiring committee's decision, also knew that Dr. Gatebe had complained to the EEOC on September 29, 2015, about Irons' decision to not choose him for a management position.  *See* ECF No. 76-3 at 1; ECF No. 76-51 at 26; ECF No. 76-50 at 8.  That EEO activity, however, occurred three years before Dr. Gatebe's Hydrological Sciences non-selection and, thus, cannot be considered sufficiently "proximate" to be relevant.  *See, e.g., Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 792 (D. Md. 2020) (noting that a lapse of two-and-a-half months is "sufficiently long so as to weaken significantly the inference of causation") (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two.").

is the only basis for the claim," and "gradual adverse job actions began well before" the protected activity, "an inference of retaliation does not arise."  *See id.* (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).  *Cf. Sempowich*, 19 F.4th at 654 (reaffirming *Francis v. Booz, Allen & Hamilton, Inc.*).

Employing these principles here, no rational trier of fact could conclude that Dr. Gatebe's non-selection was retaliatory.  It is undisputed that Dr. Gatebe had not been selected during the fourth round of interviews, *before* he attests to having told Dr. Rodell about his EEO activity. Notably, Dr. Gatebe does not challenge the fourth round interview process, and the record indisputably shows that Dr. Rodell decided not to hire Dr. Gatebe after substantive and comprehensive evaluation.  Most importantly, the selection of Dr. Tuttle stemmed from the entire committee's sincere belief that Dr. Tuttle, not Dr. Gatebe, was the best person for the job. *See* ECF No. 76-30 at 20, 23; *Nahkid*, 2022 WL 2678742, at *2.  Thus the record, viewed most favorably to Dr. Gatebe, reflects that he had not received the job in the fourth round because he was not considered the best candidate.

Accordingly, the undisputed, legitimate decision to not hire Dr. Gatebe in the fourth round breaks the already weak inferential chain that his subsequent fifth round non-selection was retaliatory.  *See Francis*, 452 F.3d at 309.  In this circumstance, "temporal proximity" between the non-selection and disclosure of EEO activity alone cannot sustain the claim.  Summary judgment as to retaliation must be granted in NASA's favor.

IV.     **Conclusion**

For the foregoing reasons, NASA's motion to dismiss or, in the alternative, for summary judgment is GRANTED.  Judgment in favor of the Agency is entered on all remaining claims.  A separate Order follows.


July 22, 2022                                              _____/s/_____
Date                                                                Paula Xinis
                                                                        United States District Judge